UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
ADONIS McDOWELL,

    Plaintiff,

                 03 CV 2058 (SJ)

  -against-             MEMORANDUM
                   AND ORDER
FATHER FLANAGAN'S BOYS' HOME,

    Defendant.
-----------------------------------------------------X

APPEARANCES:

JAY M. WEINSTEIN
503 Longacre Avenue
Woodmere, NY 11598-2307
Attorney for Plaintiff

JACKSON LEWIS, LLP
59 Maiden Lane
New York, NY 10038-4502
By: Jennifer Beth Courtian
Attorney for Defendant

JOHNSON, Senior District Judge:

  Plaintiff Adonis McDowell ("Plaintiff") brought this action against Defendant Father Flanagan's Boys' Home ("Defendant") alleging race and disability discrimination in violation of 42 U.S.C. § 2000e et seq. ("Title VII"); the New York State Human Rights Law, New York Executive Law § 290 et seq. ("Human Rights Law"); the New York City Administrative Code, N.Y.C. Admin. Code § 8-101 et seq. ("Administrative Code"); and 42 U.S.C. § 12101 et seq. ("Americans With Disabilities

1

Act," or "ADA"), and claiming wrongful discharge. Plaintiff seeks $10 million in damages on each of five counts of the Complaint. Presently before this Court is Defendant's Motion for Summary Judgment ("Motion"). For the reasons stated herein, Defendant's Motion is GRANTED.

## STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "On a motion for summary judgment, the moving party has the burden of showing the absence of a genuine issue of material fact, and the district court's task is limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them." Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998). In deciding such a motion, this Court "must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor." Id.

## FACTUAL BACKGROUND[1]

According to Plaintiff's Complaint, Plaintiff was an employee of Defendant from 1994 through August 19, 2002. (Id. ¶ 13–14.) In late 1999 or early 2000, Plaintiff

---

[1] Because the Court finds, as discussed below, that Plaintiff has abandoned or conceded all his claims regarding race discrimination, the Court will not recite the facts that are specific to Plaintiff's race discrimination claims.

2

received some type of promotion, although the parties are in disagreement as to the exact nature of the promotion. (Id. ¶ 15; Ans. ¶ 15.) Plaintiff's job title then changed again shortly afterwards — a change that Plaintiff considers a demotion, although Defendant does not depict the change as such. (Compl. ¶ 16; Ans. ¶ 16.)

On February 9, 2000, Plaintiff injured his back in a motor vehicle accident. (Compl. ¶ 24.) Plaintiff was absent from work for somewhere between 18 days and one month subsequent to this accident. (Id. ¶ 26; Ans. ¶ 26.) On January 29, 2002, Plaintiff was injured again, in a second motor vehicle accident ("the 2002 accident"). (Compl. ¶ 25.) Plaintiff was absent from work for approximately two weeks following this accident. (Id. ¶ 28; Ans. ¶ 28.) Plaintiff states that Defendant pressured him to return to work after the 2002 accident despite the fact that his doctor recommended against returning to work. (Compl. ¶¶ 29, 31.) The notes written by Plaintiff's doctor state that Plaintiff was totally incapacitated from January 19, 2002 to February 4, 2002 and was "not able to resume his work activities at *that* time" (Lauri Aff. Exs. Y, Z (emphasis added).) Plaintiff did not return to work until after February 4, 2002. (See Compl. ¶ 28; Ans. ¶ 28.)

At the time of the 2002 accident, Plaintiff was working as a night shift supervisor. (Id. ¶ 32.) As part of this job, Plaintiff's Complaint states, he was required to do cleaning, lifting, and walking up and down stairs, all of which he was later "unable to do as a result of [the 2002] accident." (Id. ¶ 33.) At some unspecified later

3

P-049

date, prior to Plaintiff's termination, Plaintiff was temporarily transferred to a daytime supervisory position. (Id. ¶ 35; Ans. ¶ 35.) The daytime jobs apparently require tasks involving more physical exertion, such as transporting children from the shelter to other locations, and so this scheduling change posed a problem for Plaintiff because of his physical limitations. (Pl. Aff. Opp'n Def.'s Mot. Dismiss ¶ 5.) Plaintiff states that he was coerced into taking the daytime job with threats that his employment would otherwise be terminated, but Defendant denies this allegation. (Compl. ¶ 36; Ans. ¶ 36.)

Plaintiff also states that he was cleared by Defendant for some type of "light duty" work, but was never actually offered lighter duty work. (Compl. ¶¶ 34, 37.) Defendant states that Plaintiff was never cleared by Defendant for light work, but merely submitted a note from his own doctor requesting that he be placed on light duty. (Ans. ¶ 37.)

Plaintiff was given feedback on January 25, 2002 stating that during a visit to the shelter at 1:00 am, the nightly log books had not been filled out or updated. (Lauri Aff. Ex. U.) On August 7, 2002 a surprise inspection was conducted at the shelter where Plaintiff worked. (Id. Ex. EE.) An internal memorandum dated August 9, 2002 explains that an inspection was first conducted at a different shelter in response to allegations that youth had been engaging in sexual activity at the shelter; although a preliminary investigation turned up no evidence that youth were engaging in sexual

4

P-049

activity, it appeared that there was a problem with staff sleeping on duty. (Id. Ex. DD.) This finding led to the inspection at Plaintiff's workplace, as well as similar inspections at other shelters around the country. (Id.) This memorandum recommended that Plaintiff and another individual be terminated. (Id.)

According to an internal memorandum dated August 14, 2002, Marcus Corbett, who conducted the inspection, concluded that Plaintiff was sleeping on the job, that one of his subordinates who Plaintiff was charged with supervising was also sleeping, and that the logbooks which Plaintiff and his subordinates were responsible for keeping had been falsified. (Id. Ex. EE.)[2] The exhibits submitted by Defendant demonstrate that the

---

[2.] The memorandum states:
> On August 7th at 3:50 am, I entered the Dean Street Facility. Shift Supervisor Adonic McDowell and YCW Donnell Mills and YCW Ed Jackson were on duty.
> Shift Supervisor Adonis McDowell was in the basement. He claims to have been using the bathroom. My assumption is that he was downstairs sleeping. He also stated that he made 3 observations during the hours of 10:30 pm - 3:30 am. He did ensure that the overnight census had been faxed. One of his duties was to oversee that [sic] the logbook was kept up to date for the entire shift, which was from 11:00 to 8 am and the last entry on it was at 11:00 pm. Another one of his duties done incorrectly was to oversee that [sic] a youth who had been placed on 1 to 1 was being watched carefully and that the form was filled out correctly. When I arrived at 3:50 am the form had already been filled out till 6:30 am.
> Youth Care Worker Donnell Mills was sitting at the front desk on the third floor facing the wall. My assumption was that he was wide-awake. He had ensured me that the laundry was done. One thing that he did not do was to oversee the logbook and monitor the youth that was placed on a 1 to 1 watch. Mr. Mills was the staff member that filled out on [sic] the night monitoring and 5 minute watch forms ahead of time.
> Youth Care Worker Ed Jackson was doing bedroom checks as I entered the 3rd floor vicinity. My assumption was that he was sleeping in the TV room because his shoes were off and the TV was on. He was also startled to see me because he proceeded to wake the youths at 4 am to get them ready for school. Which leads me to believe he was not aware of the time.
> The facility had not been cleaned either. The garbage had not been taken out and the floors were neither mopped, swept nor vacuumed. The nigh monitoring sheet had also been filled out way ahead of time.

(Lauri Aff. Ex. EE.)

P-049

logbooks had in fact been filled out ahead of time (Id. Exs. FF, GG), and Plaintiff has not argued that they were not falsified.

A memorandum dated August 16, 2002 summarizes the disciplinary actions that would be taken with respect to Plaintiff and eighteen other employees at various shelters. (Lauri Aff. Ex. HH.) According to this memorandum, one other employee would be terminated. (Id.) He and Plaintiff are the only employees listed who were reported to have previously received feedback on the same type of infraction. (Id.) Defendants state that the other employee who was terminated was not disabled (Scott Aff. ¶ 13), and Plaintiff has not contested this assertion. (See Pl. Aff. Opp'n Def.'s Mot. Dismiss ¶ 17.)[3] Plaintiff's employment was terminated on August 19, 2002. (Compl. ¶ 38; Ans. ¶ 38.)

## DISCUSSION

### I. Plaintiff's Race Discrimination Claims

Defendant asserts that two of Plaintiff's race discrimination claims, regarding incidents of demotion and failure to promote occurring in 1996 and 1999–2000, are time-barred because they were not brought within the applicable statutes of limitations. Defendant also states that Plaintiff's race discrimination claim related to his termination

---

[3.] Plaintiff points out that the other employee who was terminated is African American, and that this employee brought a race discrimination suit against Defendant on the basis of his termination. (Pl. Aff. Opp'n Def.'s Mot. Dismiss ¶ 17.) However, the Court takes judicial notice of the fact that in that suit, the court found that Defendant had not engaged in racially discriminatory behavior; rather, Defendant was found to have terminated the other employee because he was not fulfilling his job duties in that he was sleeping on the job. Hansberry v. Father Flanagan's Boys' Home, 2004 WL 3152393, *8 (E.D.N.Y. Nov. 28, 2004).

6

P-049

should be denied because Plaintiff conceded in his deposition that his termination was not based on race discrimination. (Def.'s Mem. Law Supp. Mot. Summ. J. at 3–6; Pl. Dep., May 4, 2004 at 271, 279.)[4] Plaintiff's Reply to the Motion did not contest any of these arguments regarding the race discrimination claims, and did not pursue the claims, focusing only on the disability claims. (Pl. Mem. Law Opp'n Def.'s Mot. Dismiss; Pl. Aff. Opp'n Def.'s Mot. Dismiss.) This Court therefore finds that Plaintiff's claims based on the incidents in 1996 and 1999–2000 are time-barred, and that Plaintiff's claim based on his termination has been conceded and abandoned. There are no remaining race discrimination issues in the case.

## II. Plaintiff's ADA Claims

Plaintiff contends that he became disabled as a result of the motor vehicle accidents, and that Defendant could have accommodated his disability without suffering undue hardship by permitting him to work a modified or part-time work schedule, or by reassigning him to a vacant position. (Compl. ¶¶ 51–53.) Plaintiff states that instead of accommodating his disability, Defendant discriminated against Plaintiff on the basis of his disabilities, first by limiting the work options made available to Plaintiff and ultimately by terminating Plaintiff's employment. (Id. ¶ 57.)

The ADA makes it unlawful for covered entities to "discriminate against a

---

[4.] Plaintiff answered "No" to the question, "Did you think that your termination was because of your race?" and stated, in reference to the termination, that, "This instance wasn't because of my race." Pl. Dep., May 4, 2004 at 271, 279.

7

qualified individual with a disability because of the disability of such individual in regard to . . . terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (2004). In this case there is no direct evidence of discrimination: Plaintiff has acknowledged that his supervisors did not make negative comments about his medical condition apart from the alleged pressure to return to work and to work during the days[5] and did not discipline him due to his absences from work,[6] and that he does not have any evidence that his termination was due to his disability.[7] Where there is no direct evidence of discrimination, an ADA claim must be analyzed under the three-step burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U .S. 792 (1973). See Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown,

---

[5] Question: You said the comment that Marcus made to you was he was tired of you complaining all the time and that it was in the context of not wanting to change your shift.
Plaintiff: Right. And that was because of my medical condition I was unable to change my shift, because of the rigorous demands working the days as opposed to nights.
. . .
Question: . . . were there any other times that Marcus made any comments to you that you felt were negative regarding your medical condition?
Plaintiff: Nothing that he said to me directly, no.
Question: How about Lyn, were there any comments that he made to you that you thought were negative regarding your medical condition?
Plaintiff: Not negative, but not keeping into consideration my medical condition and putting pressure on me to return to work before I was really able to.
(Pl. Dep., May 4, 2004 at 288–89.)

[6] Question: Did you ever receive any disciplinary warnings or notices due to your absence from work?
Plaintiff: Nope.
(Pl. Dep., May 24, 2004 at 341.)

[7] Plaintiff: I just feel that if I didn't have those [physical] limitations I would still be employed at Father Flanagan's today.
Question: Do you have any evidence that if you didn't have those limitations you'd still be employed?
Plaintiff: No. I'm offering that as an opinion.
(Pl. Dep., May 4, 2004 at 306.)

8

294 F.3d 35, 48 (2d Cir. 2002) (applying <u>McDonnell Douglas</u> standard to ADA claim).

Under <u>McDonnell Douglas</u>, a plaintiff must first establish a *prima facie* case of discrimination. <u>McDonnell Douglas Corp.</u>, 411 U.S. at 802. The *prima facie* elements of an ADA claim are: (1) the plaintiff's employer is subject to the ADA; (2) the plaintiff was disabled within the meaning of the ADA; (3) the plaintiff was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) the plaintiff suffered an adverse employment action because of her disability. <u>Jacques v. DiMarzio, Inc.</u>, 386 F.3d 192, 198 (2d Cir. 2004) (citing <u>Cameron v. Cmty. Aid for Retarded Children, Inc.</u>, 335 F.3d 60, 63 (2d Cir. 2003)).

Once the plaintiff has established a prima facie case, the burden shifts to the defendant, who must state a legitimate, non-retaliatory reason justifying the allegedly improper employment action. <u>McDonnell Douglas Corp.</u>, 411 U.S. at 802–03. If the defendant meets this burden, the third step is that the plaintiff must point to evidence that would permit a reasonable jury to find that the proffered reason is merely a pretext for discrimination. <u>McDonnell Douglas Corp.</u>, 411 U.S. at 807.

Defendant argues that Plaintiff has failed to establish a *prima facie* case of discrimination because he has not demonstrated that he is disabled for purposes of the ADA, as required for the first prong, and because he has not established any nexus between his alleged disability and the adverse employment actions, as required for the fourth prong. Alternatively, Defendant asserts that even if Plaintiff has established a

*prima facie* case, Defendant has articulated a valid, non-discriminatory basis for Plaintiff's termination that Plaintiff has not demonstrated to be pretextual: namely, that Plaintiff failed to meet the requirements of his job in that he was allegedly sleeping when he should have been supervising his co-workers and the children in the shelter.

A.   *Plaintiff's Prima Facie Case*

The Court finds that Plaintiff has not met the first requirement for establishing a *prima facie* case under the ADA, in that he does not qualify as disabled for purposes of the ADA. "[A] physical impairment . . . standing alone, does not necessarily constitute a disability under the ADA" because "an impairment 'may affect an individual's life without becoming disabling.'" Cavallaro v. Corning Inc., 93 F.Supp.2d 334, 343 (W.D.N.Y. 2000) (quoting Hazeldine v. Beverage Media, Ltd., 954 F.Supp. 697, 703 (S.D.N.Y. 1997)).

In order to establish that he is or was disabled under the ADA, Plaintiff must demonstrate that he has "a physical or mental impairment that substantially limits one or more . . . major life activities[.]" E.g., Richter v. Monroe County Dept. of Soc. Serv., 2005 WL 351052, *8 (W.D.N.Y. Feb. 11, 2005).[8] With respect to the requirement that there be a *major life activity* that is impaired, major life activities are defined to include caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. 29 C.F.R. § 1630.2(l). With respect to the

---

[8] The two other types of disabilities identified in the ADA — a record of such an impairment or being regarded as having such an impairment, Richter, 2005 WL 351052 at *8 — are not at issue in this case.

10

requirement that the major life activity be *substantially limited*, an individual must be: "1) unable to perform a major life activity that the average person in the general population can perform; or 2) significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1).

"To be substantially limited in the major life activity of working, then, one must be precluded from more than one type of job, a specialized job, or a particular job of choice." Richter, 2005 WL 351052 at *8 (quoting Sutton v. United Airlines, Inc., 527 U.S. 471 (1999)). Rather, in order to make a claim that an individual is disabled with respect to working, a plaintiff must "allege [that he is] unable to work in a broad class of jobs." Sutton, 527 U.S. at 491; see also 29 C.F.R. § 1630.2(j)(3) (explaining that with respect to working, "[t]he term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities," and that "[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working").

The physical limitations or inabilities that Plaintiff has identified are: he had to stop playing basketball; he had to take baths instead of showers; he was unable to pick his son up out of his wheelchair; he was unable to do yard work or roofing at home; he

11

had difficulty lifting heavy objects; he had difficulty climbing stairs; and he found the activities involved in the daytime shift at work challenging, painful, and tiring. (Pl. Dep., May 24, 2004 at 98–100, 223, 234, 295–98; Pl. Mem. Law Opp'n Mot. Summ. J. at 12.)[9]

Courts have previously held that none of these limitations or inabilities constitute substantial limitations on a major life activity, and thus do not support findings that a plaintiff is disabled within the meaning of the ADA. Munck v. New Haven Sav. Bank, 251 F.Supp.2d 1078, 1083 (D.Conn. 2003) (inability to play recreational sports does not qualify as a substantial limitation on a major life activity); Gallimore v. Newman Machine Co., Inc., 301 F.Supp.2d 431, 451 (M.D.N.C. 2004) (plaintiff who was able to shower but not bathe had not demonstrated disability within the meaning of the ADA); Kashimawo-Spikes v. U.S. Bancorp, 2004 WL 1765305, *7 (D.Minn. 2004) (same); Vaughnes v. United Parcel Service, Inc., 2000 WL 1145400, *6 (S.D.N.Y. Aug. 4, 2000) (noting that child care "includes a number of activities and responsibilities, only a portion of which require optimal physical agility"); Colwell v. Suffolk Co. Police Dep't, 158 F.3d 635, 641 (1998) (performing housework other than

---

[9] The Court notes that there appears to have been a time period during which Plaintiff was completely unable to work, and was absent from his job for somewhere between two weeks to a month. (Compl. ¶ 28; Ans. ¶ 28.) However, Plaintiff has acknowledged that he was not disciplined or demoted for missing work during this time (Pl. Dep., May 24, 2004 at 341) and he did not return to work until after the date that his doctor stated that he had ceased to be unable to work. (Lauri Aff. Exs. Y, Z; Compl. ¶ 28; Ans. ¶ 28.) Given that all of Plaintiff's claims are in regards to the way he was treated by his employers after he returned to work, the Court finds that it is not relevant whether Plaintiff would have been categorized as disabled during his absence; the only question that is relevant to Plaintiff's legal claims is whether Plaintiff was disabled during the time period in which he is alleging discrimination, i.e. the time period following his return to his job.

12

basic chores, moving furniture, doing yard work, painting and plastering are not "major life activities" for purposes of ADA); Zarzycki v. United Technologies Corp., 30 F.Supp.2d 283, 288–289 (D.Conn. 1998) (difficulty performing yard work and chores such as splitting wood does not qualify as substantial limitation on major life activity); Milford v. New York City Bd. of Health, 2005 WL 195561, *6 (E.D.N.Y. Jan. 27, 2005) (difficulty climbing flights of stairs, inability to do heavy lifting, and difficulty walking long distances are not substantial limitations on major life activities) (citing Colwell, 158 F.3d at 644–45 (2d Cir. 1998); Bussa v. Alitalia Linee Aeree Italiane, S.P.A., 2004 WL 1637014, at *7–8 (S.D.N.Y. July 21, 2004)); Shaw v. Greenwich Anesthesiology Associates, P.C., 137 F.Supp.2d 48, 56 (D.Conn. 2001) (increased pain or discomfort in performing one's work does not constitute a substantial limitation on the ability to work) (abrogated on other grounds, see Beason v. United Technologies Corp., 337 F.3d 271, 281 (2d Cir. 2003)); Aquinas v. Fed. Express Corp., 940 F.Supp. 73, 78 (S.D.N.Y. 1996) (same); Baerga v. Hospital for Special Surgery, 2003 WL 22251294, *4 (S.D.N.Y. Sept. 30, 2003) (inability to perform "strenuous" physical activity is not a substantial limitation on a major life activity).

Moreover, Plaintiff has stated that despite increased difficulty and discomfort, he was always able to complete the tasks his job required.[10] Plaintiff also has not

---

[10.] Question: Were you able to perform your job duties?
Plaintiff: Well, I did them.
Question: And were you able to do them?
Plaintiff: Well, it was very painful at times, but I did them.
(Pl. Dep., May 24, 2004 at 223.)

13

P-049

alleged that he is unable to work in a broad class of jobs, which alone is sufficient to find that he is not disabled for purposes of the ADA. Sutton, 527 U.S. at 491; 29 C.F.R. § 1630.2(j)(3). The Court therefore must find that Plaintiff has not demonstrated that he is disabled under the meaning of the ADA, and thus that he has not established the first prong of his *prima facie* case.

Additionally, the Court finds that Plaintiff has failed to establish the fourth prong of his *prima facie* case with respect to his termination, in that he has demonstrated no nexus between his alleged disability and his termination. As mentioned above, the other employee who was terminated was not disabled. (Scott Aff. ¶ 13.) The fact that an employee outside the protected group engaged in similar behavior and was treated no more favorably than Plaintiff suggests that the decision was not motivated by discrimination and supplies an adequate basis for the Court to conclude that Plaintiff has failed to establish the fourth prong of his *prima facie* case. See Bussa, 2004 WL 1637014 at *9; Fitzpatrick v. New York Cornell Hosp., 2003 WL 102853, *6 (S.D.N.Y. Jan. 9, 2003). All evidence points to the conclusion that Plaintiff was terminated because he was believed to be sleeping on the job and because the

---

Question: Were you able to get your job duties accomplished when you returned to work in February of 2002?
Plaintiff: Always did.
Question: Was there any job duty you couldn't get done?
Plaintiff: Well, at the time things I couldn't do I delegated.
(Id. at 234.)

Question: You were able to get the essential functions at our job at Father Flanagan's completed, correct?
Plaintiff: Every day.
(Id. at 298.)

14

logbooks were falsified.[11]

## CONCLUSION

For the reasons stated herein, Defendant's Motion for Summary Judgment is GRANTED with respect to Plaintiff's Title VII and ADA claims. As Plaintiff's only federal causes of action have now been dismissed, this Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims pursuant to 28 U.S.C. § 1367(c)(3). Therefore, Plaintiff's Title VII and ADA claims are dismissed with prejudice, and Plaintiff's claims pursuant to New York State Human Rights Law and the New York City Administrative Code are dismissed without prejudice.

The Clerk of Court is directed to enter a final judgment in favor of Defendant and to close the case.

SO ORDERED.

Dated: April 26, 2005
Brooklyn, New York

_____
Senior U.S.D.J.

---

[11] Plaintiff has acknowledged that employees who are sleeping on the job at the shelter are "not providing a safe environment at the facility" (Pl. Dep., May 4, 2004 at 171), that "if you're sleeping on the job you could be terminated" (id. at 120), that "Father Flanagan's has no tolerance for individuals falling asleep while on their shift" (id. at 98), and that as a supervisor he was "responsible for everything that happens at the facility," including accurate completion of the logbooks (id. at 150–51). The Court notes that even if Defendant's decision-makers were incorrect in their assumption that Plaintiff was sleeping at work, an erroneous decision, if genuinely non-discriminatory, does not provide a basis for an ADA claim. An "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or no reason at all, so long as its action is not for a discriminatory reason." Mohamed v. Marriott Intern., Inc., 905 F.Supp. 141, 155 (S.D.N.Y. 1995).

15